**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

                     -against-                           **MEMORANDUM OF**
                                                **<u>DECISION AND ORDER</u>**

RW PROFESSIONAL LEASING SERVICES    02 CR 767 (ADS) (MLO)
CORP., also known as "Professional Leasing
Services," ROCHELLE BESSER, also known
as "Rochelle Drayer," BARRY DRAYER,
ROGER DRAYER, ADAM DRAYER,
MYRNA KATZ, STEPHEN BARKER, and
PAYADDI SHIVASHANKAR,

                                     Defendants.
-------------------------------------------------------------X

**<u>APPEARANCES:</u>**

**ROSLYNN R. MAUSKOPF, UNITED STATES ATTORNEY**
**EASTERN DISTRICT OF NEW YORK**
610 Federal Plaza
Central Islip, NY 11722
        By:    Steven L. Tiscione, Assistant United States Attorney,
                Geoffrey R. Kaiser, Assistant United States Attorney

**KEVIN J. KEATING, ESQ**
Attorney for the Defendant Stephen Barker
666 Old Country Road
Suite 501
Garden City, NY 11530-2004

**SPATT, District Judge.**

       This criminal prosecution arose out of a complex fraud scheme involving a

financing brokerage company that was based on Long Island and in Massachusetts

known as RW Professional Leasing Services, Inc., ("PLS"). The indictment charged

the defendants Barry Drayer ("Drayer") and Stephen Barker ("Barker") (collectively

the "Defendants"), among others, with one count of conspiracy to commit bank fraud and wire fraud in violation of 18 U.S.C. §§ 371, 1343, 1344, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(I), 1956(a)(1)(B)(I), 1956(h).  In addition, the Defendant Drayer was charged with five counts of bank fraud, in violation of 18 U.S.C. § 1344.  On February 17, 2006, after a three-week trial, the Defendants were convicted on all counts.

Currently before the Court are *pro se* motions by the Defendant Barker: (1) for a judgment of acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."); and (2) for a new trial under Fed. R. Crim. P. 33.  Despite the fact that the Defendant Barker is represented by counsel and counsel previously filed motions on Barker's behalf, Barker has also filed post-trial pro se motions.

## I.  BACKGROUND

The background of this case is set forth in the Court's Memorandum of Decision and Order of September 29, 2006.  Familiarity with that decision is assumed.  The relevant facts are repeated for clarity.

### A.    PLS Lending Practices

PLS operated from 1991 to 2002 as a provider of financing to medical professionals who wished to purchase new medical equipment or obtain funding in connection with maintaining a medical practice.  PLS operated out of two offices, one in Island Park, New York, and the other in Massachusetts.  The Massachusetts office

handled collections, credit, customer service, and all dealings with lenders and funding sources. Drayer managed the Massachusetts office of PLS on a day-to-day basis, and also made decisions for the company as a whole. He was officially the Vice-President and a Director, but he called himself the chief executive officer of the company. Susan Cottrell worked for Drayer in the Massachusetts office of PLS. She was responsible for running credit checks for loan applications and typing up documents for the loan contracts.

The New York office handled most clerical and administrative functions and maintained the company's bank accounts. Rochelle Besser, Drayer's sister, ran the New York office. She was officially designated as the President and a Director the company. However, Drayer stated in a deposition taken in connection with civil litigation between PLS and AT&T that was read into the record, that although in the "technical sense" he reported to Besser, in many instances he made the final decision. Roger Drayer, Barry Drayer's brother, was the Vice President of Marketing and Operations. He was responsible for sales and marketing in the New York office. Cottrell, Roger Drayer, and Besser all testified at the trial against the Defendants as cooperating witnesses for the government.

PLS was a company that arranged for financing for medical providers. PLS did not originate the funding for the loans it issued, but rather acted as the financing broker. In this capacity, PLS arranged to obtain financing for medical professionals

from lending institutions, and also serviced the loans after they were issued. PLS typically engaged in three types of transactions: (1) equipment leasing transactions, in which PLS would directly buy equipment chosen by a medical professions and lease the equipment back to the doctor; (2) sale-leaseback transactions, in which a doctor would sell existing equipment to PLS and PLS would lease the same equipment back to the doctor; and (3) working capital loans, in which money was lent to the doctor without any specific collateral, other than a blanket lien against the practice.

PLS had relationships with a variety of financial companies to either provide capital loans directly to the borrower, or lend PLS funds for the purpose of entering into leases with medical providers. These funding sources included federally-insured community banks, through a broker known as Crawford & Sons, and non-bank lenders such as AT&T Capital and First Sierra.

The federally-insured community banks, such as Alliance Bank, Northwest Bank, and People's Bank, engaged in portfolio lending, in which the bank would lend money to PLS based on an agreement that included a portfolio or group of equipment leases. Under the terms of the agreements, PLS typically serviced the loans that were made to the medical providers. If an individual borrower, such as a doctor, prepaid the loan by paying the balance of the loan early, PLS was required to either remit those proceeds to the funding institution or substitute the paid off lease with a new

lease of equal value. Similarly, if a borrower defaulted or went bankrupt, PLS was required to either pay the bank or substitute another transaction.

The non-bank lenders, First Sierra and AT&T Capital, serviced their own loans. First Sierra and AT&T used a "lock-box," in which invoices under the PLS name were sent to the doctors, and the doctors wrote checks payable to PLS, and PLS forwarded the checks to a mailbox under the lender's control. If a doctor's payment was late, PLS had the obligation to collect money from the doctor. If the borrower defaulted, PLS was responsible to pay the full amount of the loan to the lender. If a doctor went bankrupt, PLS was required to notify the lender and pay the loan in full or "substitute" it, that is, PLS would finance another loan with its own money and then assign the stream of payments to the lender.

Within this framework, PLS, under the direction of Barry Drayer, devised a number of schemes to defraud the funding institutions by concealing the nature of the collateral, the distribution of the loan proceeds, and the payments made on the loans. These schemes included, but were not limited to, the following: (1) the use of phony and forged financial instruments; (2) the "Mailbox Etc." and "Pay Ahead" scheme; (3) the multiple lending scheme; (4) the Riteway and GHT sham companies; (5) the Hospitality Services of Middle Tennessee ("HSMT") scheme; (6) the Carefree and MedPro conspiracy; and (7) the concealment of records from auditors.

**B.** **The Fraudulent Scheme Involving Stephen Barker**

**1.** **The Carefree and MedPro Conspiracy**

Defendant Barker controlled two companies based in California known as MedPro Equipment Co. ("MedPro"), and Carefree Financial Services ("Carefree"). Under the direction of Barker, Carefree acted as a broker for PLS, preparing and remitting loan applications to PLS for submission to the lending institutions. The government characterized MedPro as Barker's sham corporation with the sole purpose of issuing false medical equipment invoices to ensure that inappropriate lending applications would be approved. Carefree used the same types of documents as PLS and nearly all of Carefree deals sent to PLS had MedPro invoices indicating that the loan was secured with new medical or dental equipment.

Cottrell testified that she received the finalized loan documents from Carefree for PLS. Cottrell reviewed the documents and forwarded the applications to Crawford & Sons, who would forward them to the community banks. On First Sierra deals, Cottrell would send the documents to the PLS New York office, which would then forward them to First Sierra. Cottrell stated that MedPro invoices often falsely purported to show equipment being purchased by PLS from MedPro, and shipped to doctors. PLS paid out loans by sending a wire transfer to a MedPro bank account and commissions to Carefree by a separate check. These commissions were approved by Barry Drayer. In total, hundreds of Carefree deals were funded by First Sierra.

Cottrell conducted verbal audits on MedPro deals.  On these verbal audits, Barker called the doctor and arranged for a conference call between the three parties. (Tr. 2406–407).  Cottrell did not ask any questions regarding equipment because the doctors already had the equipment and it was not new equipment.  Cottrell stated that she conducted hundreds of verbal audits with Barker on MedPro deals.  In those hundreds of verbal audits, neither Cottrell nor Barker ever mentioned the name MedPro. (Tr. 2408–409).

In addition, Cottrell testified that she prepared delivery and acceptance receipts for loan packages.  These receipts purported to certify that equipment involved in a particular loan had been "delivered, inspected, installed, is in good working condition, and accepted by the undersigned [doctor] as satisfactory." ( Tr. 2411; Gov't Ex. Ab-5C).  Carefree prepared the delivery and acceptance receipts on MedPro deals. (Tr. 2410-411).  The receipts were included in MedPro applications to the banks at the direction of Barry Drayer.  Cottrell believed that the receipts were not truthful representations because the equipment on MedPro deals was not new, and thus had not been delivered, inspected, and accepted by the doctors. (Tr. 2411-412).

Tallie Jo Allen, who worked at Carefree as an administrative assistant from June of 1999 through April of 2002, prepared loan documents and sent them to doctors for execution.  Allen testified that 100 percent of Carefree's business was done with PLS.  (Tr. 1029–30).  Allen explained that she would send out blank

applications for the doctors' signatures and if Carefree did not receive an equipment list from the doctor, Carefree would fill in the list after the doctor had signed the blank document and sent it back to Carefree. (Tr. 1038). Allen did not know whether the equipment list provided by the doctor listed new equipment or equipment already owned by the doctor, but all of the schedules listed equipment under the heading "new equipment description." Allen was never instructed to change the list to included used equipment.

Allen also prepared MedPro invoices and answered a phone line for MedPro, even though she was not an employee of MedPro, and never met any employees of MedPro. Allen was not aware of any address, building, or other physical location for MedPro other than the P.O. Box listed on the invoice. She never took any customer orders for equipment and was not aware of anyone else in the office taking equipment orders from customers for MedPro. (Tr. 1045). There was never any equipment stored in the office and Allen never saw any reason to believe that MedPro had a warehouse where equipment was kept.

MedPro invoices were always billed to PLS, and never to another company. (Tr. 1045-46). Allen created approximately 200 MedPro invoices, which were sent to PLS along with the rest of the loan paperwork. (Tr. 1040-41). Barker instructed Allen how to prepare the MedPro invoices. The MedPro invoice was created by inserting the equipment listed by the doctor in the loan application into a template. The

template had "Professional Leasing" inserted as the standard "sold to" company on every invoice. (Tr. 1045–46). The total amount for the invoice was provided to Allen by Stephen, Evan or Bryn Barker, and the value on the invoice always equaled the amount of the loan. Allen added the doctor's address in the "ship to" box on the MedPro invoices, but never arranged for any equipment to be shipped from MedPro to the doctor, nor was she aware of any equipment ever being shipped. Sometimes Allen would receive invoices from other vendors showing that the doctors had purchased equipment from another vendor and not MedPro. However, this equipment that was purchased from other vendors was still inserted on the MedPro invoices as new equipment sold by MedPro.

Allen testified that every deal involving equipment contained a MedPro invoice. If there were mistakes in an invoice, Allen would simply correct it and send a new invoice to PLS without contacting anyone from MedPro. If she ever had any questions regarding MedPro, she would ask Barker. Allen never received a call from a doctor asking about MedPro and never mentioned the name MedPro to any doctors. (Tr. 1041-42). MedPro invoices were not signed by doctors and were never sent to the doctors. (Tr. 1042-43). In fact, she was instructed by Stephen Barker to "say that we didn't have the equipment." (Tr. 1050).

Several doctors who applied for financing with Carefree testified at the trial. Doctor Tim Silegy, an oral and maxillofacial surgeon, testified that in 2000 he applied

for a working capital loan in the amount of $50,000 and an additional $25,000 loan from Carefree Financial. After receiving the proceeds of the loans, Dr. Silegy canceled the $25,000 loan and sent a check for $25,000 to PLS. (Tr. 1186, 1188-91). Sometime later, Dr. Silegy received a billing inquiry from Alliance Bank requesting payment on the cancelled loan. (Tr. 1191–92, 1194–95). When showed a MedPro invoice, (Gov't Ex. AB-1D), for new equipment attached to the Alliance Bank loan, Dr. Silegy stated that he had not received this invoice and that the listed equipment was not new, but had already been in his office at the time of the loan.

Dr. Anita Srinivasa, an internist, testified that she applied for financing from Carefree Financial in 2001 to purchase an existing medical practice in Thousand Oaks California. (Tr. 1265–66). Dr. Srinivasa dealt with Stephen Barker at Carefree and arranged for two loans, a $50,000 working capital loan and a $55,000 equipment loan. (Tr. 1266). According to Dr. Srinivasa, the $105,000 in borrowed funds was for the purchase of an existing medical practice and old equipment that was already present in the office of the practice. Dr. Srinivasa testified that she received the $50,000 for the working capital loan, but never received the proceeds for the $55,000 equipment loan. Despite having never received the proceeds from the loan, Dr. Srinivasa received invoices from Crown Bank Leasing seeking payment on the equipment loan. (Tr. 1275). When showed a MedPro invoice, (Gov't Ex. CB-2A), from the Crown Bank loan that Dr. Srinivasa was billed for, but had never received, Dr. Srinivasa stated that

she had not received this invoice in connection with her loan. She testified that the invoice was false because she did not purchase any new equipment from MedPro as part of the deal, and the equipment listed on the invoice was existing equipment in the office that she was purchasing, not new medical equipment. (Tr. 1268-71).

**C.    Procedural History**

On February 17, 2006, after a three-week trial, the Defendants were convicted on all counts. In May 2006, the Defendants moved, through counsel, to set aside the verdict and for a new trial pursuant to Fed. R. Crim. P. 29(c) and 33, following this Court's grant of an extension of time to file such motions. The Defendants argued that the evidence at trial was insufficient to support their convictions.

On September 29, 2006, this Court denied the motions. This Court reviewed the evidence presented at trial in detail and determined that the evidence was sufficient to support the Defendants' convictions.

In *pro se* motions, dated June 29, 2006 and received by the Court on July 7, 2006, following briefing of the counseled May 2006 motions, Barker moved to set aside the verdict and for a new trial. In his *pro se* supplemental motions, Barker argues that trial counsel was ineffective because he failed to hire expert witnesses; failed to prepare trial witnesses; failed to properly review documents; and was appointed at a late date. Barker further contends that the evidence at trial was insufficient to support his conviction.

In opposition to Barker's *pro se* motions, the Government argues that the motions are untimely. The Government further contends that this Court has already determined that the trial evidence was sufficient to support Barker's conviction. Finally, the Government claims that Barker's ineffective assistance of counsel claims are without merit.

## II.  DISCUSSION

**A.      The Present Post Trial Motions**

**1.      The Rule 29 Standard of Review**

The standard of review on a motion for judgment of acquittal is well-settled. In the Second Circuit it has been repeatedly stated that a defendant challenging a conviction on the basis of insufficient evidence bears a heavy burden.  United States v. Thomas, 377 F.3d 232, 237 (2d Cir. 2004); United States v. Tocco, 135 F.3d 116, 123 (2d Cir. 1998); United States v. Russo, 74 F.3d 1383, 1395 (2d Cir. 1996).  This is because the evidence must be viewed in the light most favorable to the government and all permissible inferences must be drawn in its favor.  See United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006); United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004); United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996); see also United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir. 1989).  The court also must defer to the jury's resolution of witness credibility and, where there is conflicting testimony,

to its selection between competing inferences. <u>Tocco</u>, 135 F.3d at 123; <u>see also</u> <u>United States v. Pelaes</u>, 790 F.2d 254, 259 (2d Cir. 1986).

A conviction must be sustained if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed.2d 560 (1979); <u>United States v. Desimone</u>, 119 F.3d 217, 223 (2d Cir. 1997). Further, the elements of the crimes charged may be proved entirely by circumstantial evidence. <u>See</u> <u>United States v. Sureff</u>, 15 F.3d 225, 228 (2d Cir. 1994). Also, the court must consider the evidence in its totality, and not in isolation. <u>United States v. Rosenthal</u>, 9 F.3d 1016, 1024 (2d Cir. 1993). "If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000). With these principles in mind, the Court must uphold the jury's verdict if it finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560.

## 2. The Rule 33 Standard of Review

Rule 33 states that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The rule by its terms gives the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." <u>United States v. Sanchez</u>, 969 F.2d 1409, 1413

(2d Cir. 1992); see also United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005).

In such a motion, the court may weigh the evidence and credibility of witnesses, but cannot "wholly usurp" the role of the jury. Autuori, 212 F.3d at 120; United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999). Generally, unless there are exceptional circumstances, the court must defer to the jury's resolution of conflicting evidence and assessment of witness credibility. Sanchez, 969 F.2d at 1414. "An example of exceptional circumstances is where testimony is patently incredible or defies physical realities, although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (quotations omitted).

Indeed, this standard has also been described as a "heavy burden," United States v. Fearon-Hales, No 04-231, 2005 U.S. Dist. LEXIS 21619, *3 (S.D.N.Y. Sept. 26, 2005), and "[i]t is well-settled that motions for new trials are not favored and should be granted only with great caution." United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." Ferguson, 246 F.3d at 134.

### 3. As To The Timeliness Of Barker's Motions

"A defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed R. Crim. Proc. 29. In addition, "Rule 33(b)(2) provides, 'Any motion for a

new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty, or within such further time as the court sets during the 7-day period.'" United States v. Robinson, 430 F.3d 537, 541 (2d Cir. 2005). The time limits in Rule 33 are jurisdictional. United States v. Dukes, 727 F.2d 34, 38 (2d Cir. 1984). A district court is without discretion to grant a motion for a new trial that is not timely filed. Id.

In the present case, Barker was convicted by a jury trial on February 17, 2006. The Court granted the Defendants' requests for extensions of time to file post trial motions, until May 3, 2006. Barker filed his counseled motions on May 8, 2006. The motions were denied on September 29, 2006. Barker filed the current motions by letter dated June 29, 2006, received by this Court on July 7, 2006, after the Government had filed its responses to Barker's original counseled motions. Barker filed the current motions more than four months following his conviction and did not request an extension of time from this Court. Moreover, Barker's motions are not based on any alleged newly discovered evidence. As such, the motions are untimely and must be denied.

### 4. As To The Merits

#### a. As To The Sufficiency of the Evidence

In its September 29, 2006 Memorandum of Decision and Order, this Court thoroughly reviewed the evidence presented at trial and determined that the evidence

was sufficient to support Barker's conviction.  As such, to the extent that Barker again claims that the evidence was insufficient, the motions are denied.

### b.      As To Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, a petitioner must demonstrate: (1) that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that counsel's deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see also Larrea v. Bennett, 368 F.3d 179, 183 (2d Cir. 2004).  In evaluating the first prong of this test, the Court must" 'indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that 'even the best criminal defense attorneys would not defend a particular client in the same way.' " United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (quoting Strickland, 466 U.S. at 689) (alterations in original); see also Larrea, 368 F.3d at 183.

As for the second prong, to show prejudice, a defendant must demonstrate "'that there is a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different.' " United States v. Levy, 377 F.3d 259, 264 (2d Cir. 2004) (quoting United States v. Gordon, 156 F.3d 376, 379 (2d Cir. 1998)).  " 'A reasonable probability is a probability

sufficient to undermine confidence in the outcome.' " Id. (quoting Strickland, 466 U.S. at 694)). "The court's central concern is not with 'grading counsel's performance' but with discerning 'whether despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.' " Aguirre, 912 F.2d at 561 (quoting Strickland, 466 U.S. at 696-97). Because "it is all too tempting for a defendant to second-guess counsel's assistance after conviction," Strickland, 466 U.S. at 689, the Second Circuit has instructed that a reviewing court should be "highly deferential" in assessing counsel's performance. See Pratt v. Greiner, 306 F.3d 1190, 1196 (2d Cir. 2002) (quoting Strickland, 466 U.S. at 689).

Although the test for ineffective assistance of counsel contains two prongs, the Supreme Court specifically noted that federal district courts need not address both components if a defendant fails to establish either one. Strickland, 466 U.S. at 697. In particular, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id.

In the present case, Barker argues that his trial counsel was ineffective for failing to solicit testimony from an expert witness, specifically, a forensic accountant. In addition, Barker contends that his trial counsel failed to properly prepare witnesses and failed to sufficiently review documents. The Supreme Court has noted that "[i]n

any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." United States v. Rabi, No. 03 Cr. 082, 2004 U.S. Dist. LEXIS 18492, at *5 (S.D.N.Y. Sept. 16, 2004) (citing Strickland, 466 U.S. at 691). Moreover, "[t]he decision[] whether to . . . call witnesses [is] ordinarily left to the discretion of the defense lawyer." Id. at *7; United States v. Muyet, 994 F. Supp. 550, 561 (S.D.N.Y. 1998) ("The tactical decision of whether to call specific witnesses--even ones that might offer exculpatory evidence--is ordinarily not viewed as a lapse of professional representation."). In this case, Barker fails to articulate how his attorney's decisions constituted deficient performance. Barker fails to identify potential witnesses or explain what exculpatory information his attorney would have uncovered from witnesses or documents. As discussed in this Court's September 29, 2006 Memorandum of Decision and order, the extensive evidence at the trial supports the jury's determination of Barker's guilt.

Although Barker also claims that his trial counsel was ineffective for failing to present testimony from a forensic accountant, this claim is without merit. Barker claims that a forensic accountant would have testified that Barker did not withdraw $2 million, that funds were actually paid to doctors and that $19 million was not transferred to Carefree. However, there is no evidence that such testimony would have changed the outcome of the trial. As this Court noted in its September 29, 2006

Decision, Barker was charged with conspiracy to commit bank and wire fraud, and there was sufficient circumstantial evidence for a rational jury to conclude that Barker entered into an agreement, or had a tacit understanding, to commit bank fraud and wire fraud. As this Court has determined, Barker admitted that he had met Drayer and other employees including Susan Cottrell in the early 1990's when he worked at Centaur Finance. The evidence showed that Carefree worked almost exclusively and on a daily basis with PLS. In addition, the evidence showed that MedPro was a sham company that operated in almost an identical manner to another PLS sham company.

The evidence further established that Carefree issued false MedPro invoices to show that medical providers applying for funds had purchased new equipment. Cottrell stated that MedPro invoices often falsely purported to show equipment being purchased by PLS from MedPro, and shipped to doctors. Barker participated in the verbal audits of the doctors conducted by Cottrell in which MedPro, the purported purchaser and lessor of the equipment, was never mentioned. Several doctors who had borrowed funds through Carefree also testified that the equipment they had was not new, and that they never had any prior dealings with a company called MedPro. From this evidence, the jury was able to infer that there was an agreement, or at a minimum a tacit understanding, between Drayer at PLS and Barker at Carefree to submit fraudulent applications to banks for the purpose of obtaining loans that the banks would not have otherwise issued.

The government also showed that Barker had a financial motive to engage in the fraud. The evidence established that Barker received over $4.3 million in commissions from the fraudulent MedPro loans he brokered with PLS. Cottrell testified that these commissions had to be approved by Drayer. Moreover, by his own admission to Special Agent Howard, his entire business depended on this criminal partnership with Drayer. (Tr. 2912–13). Without Barry Drayer helping Barker push his working capital and debt consolidation loans to the banks by falsely representing them as new equipment loans, Stephen Barker probably would have had no business. Indeed, as the jury was permitted to infer from the testimony of the lender witnesses, many of the funding sources did not want to lend money on riskier loans that were not secured by new equipment. It was through the illicit agreement with Drayer, and the use of the sham company MedPro, that Barker was able to secure approximately $4.3 million in commissions.

The Court further determined that the evidence was sufficient to establish Barker's intent to commit money laundering. At the trial, the government offered evidence that $24 million was wired from PLS to MedPro, and then approximately $19 million was immediately transferred to an account held by Carefree under the control of Barker. Special Agent Galioto, testified that most of the money PLS wired to MedPro was immediately transferred to a Carefree account and dispersed as Barker saw fit. This evidence was sufficient to for the jury to find that Barker and Drayer

arranged for proceeds from the bank fraud and wire fraud—the loan proceeds that were obtained through the use of fraudulent loan documents such as the MedPro invoices—to be deposited into a MedPro account in order to make it appear that MedPro was a real company that was receiving payments on real invoices, when in fact, it was a sham company that had issued sham invoices. These financial transactions disguised the nature, source, and ownership of the original funds and promoted the unlawful activity.

Based on this evidence adduced at trial, the Court determined that the evidence was more than sufficient for a jury to find that Barker had an agreement or tacit understanding with Drayer to defraud the banks and launder money. Barker now claims that a forensic accountant's testimony could have changed the outcome because an accountant would have testified that he did not withdraw $2 million, that funds were paid to doctors and that the sum of $19 million was not transferred to Carefree. However, there is no evidence that this testimony from a forensic accountant would have altered the jury's findings. As previously stated, the Government presented evidence that $24 million was wired from PLS to MedPro, and then approximately $19 million was immediately transferred to an account held by Carefree under the control of Barker. Moreover, doctors testified that they did not receive the funds. There is no evidence that counsel's performance and tactical decisions regarding the hiring of a forensic accountant were unreasonable or

prejudicial to Barker's defense.  <u>Muyet</u>, 994 F. Supp. at 561.  Accordingly, Barker's motions are denied.

Further, although Barker claims that his trial counsel was appointed at a late date, and therefore, was unable to prepare for trial, trial counsel, Terrence Buckley, Esq., represented Barker throughout this case.  Mr. Buckley appeared on Barker's behalf in 2004.  Although Mr. Buckley was not appointed as CJA counsel until September 2005, he clearly was involved in the case from the beginning.  In addition, even from the CJA appointment date, Mr. Buckley had four months to prepare prior to commencement of the trial.  Accordingly, Barker's claim is without merit and the motions must be denied.

### III.  CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the motion by the Defendant Barker for a judgment of acquittal under Rule 29(c) is **DENIED**; and it is further

**ORDERED**, that the motion by the Defendant Barker for a new trial under Rule 33 is **DENIED**.

**SO ORDERED.**

Dated: Central Islip, New York
      June 29, 2007

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge